UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTOPHER G. HOSKAVITCH,           :
                                     :CIVIL ACTION NO. 3:14-CV-1586
            Plaintiff,               :
                                     :(JUDGE CONABOY)
            v.                       :
                                     :
CAROLYN COLVIN,                      :
Acting Commissioner of              :
Social Security,                     :
                                     :
            Defendant.               :
                                     :

_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act").  (Doc. 1.)  The Administrative Law Judge ("ALJ") who evaluated the claim concluded that Plaintiff's  severe impairments of schizoaffective disorder, obsessive compulsive disorder, morbid obesity, and obstructive sleep apnea did not meet or equal the listings.  (R. 16-17.)  The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform a full range of work at all exertional levels but with certain nonexertional limitations and that such work was available.  (R. 20-27.)  The ALJ therefore denied Plaintiff's claim for benefits.  (R. 27.)  With this action, Plaintiff argues that the decision of the Social Security Administration is error because there is a lack of substantial evidence to support the ALJ's rejection of Plaintiff's treating medical providers and the ALJ did not properly consider

the disabling effects of Plaintiff's obesity.  (Doc. 10 at 7-15.)
For the reasons discussed below, we conclude Plaintiff's appeal of
the Acting Commissioner's decision is properly denied.

## I.Background

**A.   *Procedural Background***

On December 18, 2011, Plaintiff filed a Title II application
for DIB alleging disability beginning on November 18, 2011.  (R.
14.)  Plaintiff also protectively filed an application for SSI
under Title XVI on December 18, 2011.  (*Id.*)  On both applications,
the claimant alleged disability beginning on November 18, 2011.
(*Id.*)  The applications were made due to the following:
schizoaffective disorder; obsessive compulsive disorder; essential
tremors in left hand; esophageal reflux; morbid obesity;
depression; anxiety and panic attacks.  (R. 93.)  The claims were
initially denied on January 31, 2012. (R. 93-116.)  Plaintiff filed
a request for a review before an ALJ on February 17, 2012.  (R.
127-28.)  On October 4, 2012, Plaintiff, with his attorney,
appeared at a video hearing before ALJ Gerard W. Langan.  (R. 31.)
Vocational Expert Josephine Doherty also testified at the hearing.
(*Id.*)  The ALJ issued his unfavorable decision on October 22, 2012,
finding that Plaintiff was not disabled under the Social Security
Act during the relevant time period.  (R. 27.)

On December 14, 2012, Plaintiff filed a Request for Review
with the Appeal's Council.  (R. 7-10.)  The Appeals Council denied

Plaintiff's request for review of the ALJ's decision on June 17, 2014.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On August 13, 2014, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on December 23, 2014.  (Docs. 8, 9.)  Plaintiff filed his supporting brief on January 29, 2015.  (Doc. 15.)  Defendant filed her opposition brief on April 3, 2015.  (Doc. 16.) Plaintiff did not file a reply brief, and the time for doing so has passed.  Therefore, this matter is ripe for disposition.

## B.    *Factual Background*

Plaintiff was born on April 2, 1985.  (R. 171.)  In December 2009, Plaintiff received a degree in journalism from Lock Haven University.  (R. 38.)  Plaintiff last worked as a janitor in November 2011.  (R. 174.)  Plaintiff testified that he stopped working because of what he termed a "nervous breakdown" which included overwhelming paranoia, fear, obsessive thoughts, and a severe panic attack.  (R. 39.)

## 1.    <u>Mental Impairment Evidence</u>

## a.    *Treatment Records and Notes*

Plaintiff has a long history of mental difficulties.  In 2008 and 2009, he was regularly seeing a psychiatrist, Vijay-Kumar Rekhala, M.D.  (R. 324-42.)  In April 2008, Dr. Rekhala diagnosed

Plaintiff with "major depressive disorder, chronic, recurrent, non-psychotic with comorbid anxiety," OCD, Bipolar Type II disorder, and BDD. (R. 333.) Dr. Rekhala planned to treat Plaintiff's depression and anxiety with medication. (*Id.*) He was not considering individual psychotherapy at the time because in the past Plaintiff had "bounced back to his normal functioning once his OCD and depression [had] been treated." (*Id.*) Plaintiff showed improvement in May and June of 2008 but was hospitalized at Divine Providence Hospital Mental Health Unit from July 7 to July 11, 2008. (R. 328-29.) Though he initially showed improvement after discharge, by the end of July he had some regression. (R. 329.) Delusional thinking and suicidal thoughts led to his hospitalization at Divine Providence Hospital on August 2, 2008, and his transfer to The Meadows on August 7, 2008. (R. 339.) He was discharged on August 18, 2008, reporting at his next visit with Dr. Rekhala that he had not been leveling with him about his delusions and thoughts of suicide. (*Id.*) On August 28, 2008, Dr. Rekhala noted that some symptoms were improved but Plaintiff was still delusional with persecutory thoughts and associated anxiety. (R. 328.) It was determined it was best for him to take a medical leave for the semester, and Dr. Rekhala advised him not to work (which was weekend work as a security guard at the time). (*Id.*) Plaintiff continued to have significant difficulties through the fall of 2008 and was again hospitalized in November. (R. 327.)

4

Following his inpatient treatment and some medication alterations, Plaintiff's condition improved and he decided to return to school for the Spring 2009 semester.  (R. 341.)   Plaintiff had difficulty adjusting to school and was seen on an emergency basis on January 23, 2009.  (R. 326.)  Dr. Rekhala concluded that "in addition to his past history of psychosis, depression, mood fluctuations, there is significant comorbidity of agoraphobia." (*Id.*)  Thereafter, Plaintiff showed improvement through the spring of 2009, expressing plans to finish his degree after the fall semester and seek a job upon graduation.[1]  (R. 342.)  He got a summer job working three to four days a week as a security guard on second shift and continued to improve over the summer.  (R. 325.)  In October 2009, Plaintiff's mother called Dr. Rekhala's office and reported that they had decided to follow with PCP.  (R. 324.)  She also stated that Plaintiff was doing well.  (*Id.*)

In 2010, Plaintiff was seen somewhat regularly at South Side Family Medicine by James S. Baldys, M.D., and Maureen Polakowski, CRNP, for a variety of ailments and medication management.  (*See*, *e.g.*, R. 299-312.)  On January 18, 2010, CRNP Polakowski noted that Plaintiff had been admitted three times in the past eighteen months for inpatient mental health, he was no longer in counseling, and he

---

[1]  In conjunction with being seen regularly by Dr. Rekhala, Plaintiff received outpatient services from therapist Susan E. King, MSW, at Community Services Group, All Seasons Therapy Center, in Williamsport, Pennsylvania, for treatment of his depression and anxiety in February and March of 2009.  (R. 256-62.)

had recently graduated from college.  (R. 311.)  She added that Plaintiff reported he had been stable for a number of months, and he and his mother agreed he had been doing well.  (*Id.*)  CRNP Polakowski also noted it was Plaintiff's and his mother's idea to follow up at South Side Family Medicine for Plaintiff's medications, an arrangement which was acceptable as long as Plaintiff was well controlled.  (R. 311-12.)

On May 20, 2010, Plaintiff returned to South Side Family Medicine for a medication check and reported he had been doing quite well as far as his medications were concerned.  (R. 308.)  He denied any change in thought patterns, denied hallucinations, and denied any difficulties.  (*Id.*)

On July 6, 2010, Plaintiff saw Dr. Baldys complaining of toe pain.  (R. 306.)  No notation was made concerning Plaintiff's mental health issues.

Plaintiff saw Dr. Baldys on July 23, 2010, for an "acute check" related to soreness of the upper lip.  (R. 304.)  Dr. Baldys noted that Plaintiff was not seeing psychiatry at the time and was not seeing a counselor.  (*Id.*)  He added that functionally Plaintiff had been able to work and "has not had much trouble there although he works as a security guard and is there a lot of times by himself."  (*Id.*)  Dr. Baldys did not find Plaintiff to be overly anxious although he commented that Plaintiff related that "he does not seem to be in control [of his OCD] at this point like he used

6

to be." (R. 305.) Dr. Baldys increased his Luvox dosage and suggested that Plaintiff get involved with psychiatry for medication checks and counseling. (*Id.*)

On July 26, 2010, Plaintiff, accompanied by his mother, saw CRNP Polakowski to discuss difficulty with his behavioral health issues and reported that he had been having significant anxiety and depressive symptoms. (R. 301.) Plaintiff indicated that he was frustrated with his life situation and his weight. (*Id.*) Plaintiff's mother stated that he had been having suicidal thoughts but assured her he would not act on them. (*Id.*) She also stated that Plaintiff had been doing "quite well" until recently and then began a "slow but steady decline overall." (*Id.*) Ms. Polakowski noted that Plaintiff had been stable and had refused to return to his doctor so South Side Family Medicine was monitoring his medications. (*Id.*) He was "adamant that he did not want to return to the hospital. He had been inpatient 3 times DeVine and then once at Meadows. The Meadows was a very difficult experience for him and because of this he refuses to return to the emergency room." (*Id.*) She further noted that the increase in the Luvox dosage had been three days before and Plaintiff did not see a significant improvement. (*Id.*) CRNP Polakowski objectively reported that Plaintiff had a flattened affect though he did make eye contact. (*Id.*) She commented that it was a

> [v]ery difficult situation. . . . Ultimately,
> he would obviously benefit from ongoing

> counseling.  I would wonder about partial
> program for him.  He is obviously not a
> candidate for traditional counseling I feel
> he needs more intensive management however he
> is quite resistant to inpatient management.
> As all the offices are closed now, we will
> need to contact local psychiatrist tomorrow
> to see if we did [sic] get someone to see
> him.  If there will be a delay in getting an
> appointment, and his behavior accelerates, I
> was quite honest with him that he will need
> to go to the emergency room. . . .  If there
> is a slight delay in appointment and he
> continues with behaviors we will max his dose
> of Luvox to 300 mg. daily. . . .

> This is an increasingly difficult
> situation for his mother to manage.  He has
> serious issues and she is poorly equipped to
> deal with these.  She should be in counseling
> to help her deal with these.

(R. 302.)  CRNP Polakowski commented that Plaintiff's weight was clearly an issue--that he was concerned it was going to cause serious medical problems and he had a history of obsessing over medical issues.  (*Id.*)  She noted that she reassured Plaintiff that the long term complications of obesity are what he needed to address, and they could work on an exercise plan once his depression was stabilized.  (*Id.*)

On July 28, 2010, Plaintiff attended one day of a partial hospitalization program at Williamsport Hospital, having been referred by Dr. James Baldys' office at South Side Family Medicine due to increasingly obsessive thoughts, increasing anxiety and depression and auditory hallucinations.  (R. 264.)  Plaintiff was scheduled to attend three full days of the program per week, but he

informed the staff at the end of the first day that he was reluctant to return.  (*Id.*)  He later called and left a message that he preferred to attend medication management alone.  (*Id.*)

On August 19, 2010, Dr. Baldys received a letter from Community Services Group informing him that Plaintiff was receiving therapy services through All Seasons Therapy Center with James Wool, LSW, CAC.  (R. 314.)

Plaintiff again saw CRNP Polakowski on November 10, 2010, for a rash on his right thigh.  (R. 299.)  Plaintiff's behavioral health was not discussed other than to note that Plaintiff was not too concerned with the rash which was unusual given his history of behavioral health issues.  (*Id.*)

On March 2, 2011, Dr. Baldys received a letter from Community Services Group informing him that Plaintiff was scheduled for medication management with Philipp Othmer, M.D., and Charlene Bean, LPN.  (R. 345.)

On August 18, 2011, Plaintiff saw Ms. Polakowski for back pain.  (R. 297.)  Subjectively, Plaintiff denied anxiety or depression.  (*Id.*)  Commenting that Plaintiff had been pain free "until recently," Ms. Polakowski noted that he continued to gain weight and weight was a factor with his back pain.  (R. 298.)

On August 31, 2011, Plaintiff had his initial evaluation with psychiatrist Michael Greenage, D.O., his chief complaints being his "depression and shizoaffective."  (R. 274.)  Dr. Greenage recorded

9

that Plaintiff reported the following: his shizoaffective disorder was fairly under control and his delusions had "drastically improved" with medications; his depression remained a problem with occasional suicidal thoughts; his recent prescription for Ativan was helping his anxiety; and he was doing very well with his OCD. (*Id.*)  Dr. Greenage assessed Plaintiff's anxiety and depression to be his "current issues," adding that he gets some mild and brief relief with Ativan.  (R. 275.)

On September 26, 2011, Plaintiff saw CRNP Polakowski about his weight.  (R. 294.)  He denied anxiety and depression at the time. (*Id.*)  CRNP Polakowski noted that Plaintiff had lifelong issues with his weight "which has worsened significantly recently especially as he finds his obsessive-compulsive disorder and anxiety worsening."  (*Id.*)  She acknowledged the possible link between Plaintiff's underlying psychiatric issues and his weight and reviewed possible strategies, including discussing the matter with his psychiatrist.  (R. 295.)

On September 28, 2011, Plaintiff reported to Dr. Greenage that he was doing "okay" and described his mood as "a little better." (R. 273.)  In October 2011 he reported that he was doing "a little worse" and his mood was "not so good."  (R. 272.)  In November 2011, Plaintiff's mother accompanied him to his appointment--she wanted to be sure Plaintiff was giving Dr. Greenage accurate information because Plaintiff tended to minimize his symptoms.  (R.

10

271.)  Plaintiff's mother expressed specific concerns about his depressive symptoms, anxiety about going to work, and habitual binge eating when he became more depressed.  (*Id.*)  Plaintiff reported the following: Ativan was "considerably helpful" in enabling him to get out of the house and go to work; though his mood was somewhat depressed, he was doing a bit better generally; his anxiety was a little better in terms of being able to go to work; and his OCD symptoms were under very good control.  (*Id.*) Two weeks later, Plaintiff reported that his depressive symptoms were under very good control and he did not want to make any medication changes because he was doing fairly well overall.  (R. 270.)  Dr. Greenage noted that Plaintiff "was adamant . . . that he feels his depression is not an issue currently for him."  (*Id.*) Plaintiff was to return for follow up in six weeks.  (*Id.*) Throughout this period, Dr. Greenage stated that Plaintiff's insight and judgment appeared to be fair.  (R. 270-73.)

On December 1, 2011, Plaintiff saw CRNP Polakowski about pain in his right upper thigh.  (R. 291.)  He denied anxiety and depression at the time.  (*Id.*)  CRNP Polakowski noted that Plaintiff continued to follow with the psychiatrist "which is imperative for this individual."  (R. 292.)  She also noted that he was doing well at Geisinger's obesity center, having lost thirty pounds.  (*Id.*)

On December 7, 2011, Plaintiff was seen by Mustafa S. Huseini,

M.D., at the Geisinger Nutrition Department in Danville.  (R. 422.)
Plaintiff told Dr. Huseini that his depression had been relatively
well controlled and he had no problems with his depression since
his November 9, 2011, visit.  (*Id.*)  Plaintiff denied any recent
changes in his irritability, concentration, sleep, libido or mood,
and he denied any suicidal ideation.  (*Id.*)

Plaintiff again saw Dr. Greenage on January 9, 2012.  (R.
444.)  Plaintiff reported that he was doing "a little bit worse"
and was interested in trying an antidepressant--something he had
previously been hesitant about because of the necessary change of
dosage for his OCD medication and the potential impact of such a
change on his OCD symptoms.  (R. 444.)  Dr. Greenage added Zoloft
to Plaintiff's medication regimen, decreased the OCD medication,
Luvox, and scheduled Plaintiff for a two week follow-up
appointment.  (*Id.*)  At the follow-up appointment Plaintiff
reported that he was doing "okay."  (*Id.*)  He had not noticed any
significant changes with the new medication regimen.  (*Id.*)  Dr.
Greenage noted that Plaintiff reluctantly offered that he wakes up
often in the middle of the night extremely scared and afraid, a
feeling that can persist for hours.  (*Id.*)

On February 23, 2012, Plaintiff saw Ms. Polakowski for
treatment of an ingrown toenail.  (R. 454.)  He denied anxiety and
depression at the time.  (*Id.*)  She noted that Plaintiff's weight
had increased and he had been following at Geisinger bariatric.

12

(R. 455.)

     At his appointment with Dr. Greenage on February 28, 2012,
Plaintiff reported to be doing "pretty good."  (R. 442.)  Plaintiff
also reported that his sleep had improved with the use of a CPAP
machine, he was having fewer nighttime awakenings as reported at
his last visit, and his depression was gradually improving with
some good days interspersed with the bad instead of consistently
bad days.  (*Id.*)  Dr. Greenage noted that Plaintiff denied any
auditory or visual hallucinations, adding "[h]owever, of interest,
the patient did offer today that historically one of the things
that tends to drive his depression is some delusional content, and
the patient was visually and verbally reluctant to discuss those
delusions today but he was not pressed for same."  (Id.)  Dr.
Greenage found Plaintiff's affect to be "more euthymic than
previously, mood congruent."  (*Id.*)

     On March 27, 2012, Plaintiff told Dr. Greenage he was "doing
good" and described his mood as "good"--overall about the same as
at his last visit.  (R. 441.)  Plaintiff reported that he had
noticed some general improvements but still had occasional periods
at night when he becomes "mildly depressed or extremely anxious and
feel [sic] that bad things are going to happen to him."  (*Id.*)
Plaintiff also reported that he had a disagreement with his boss
and had become fearful of working for him, ultimately deciding that
it would be better if he did not have the job.  (*Id.*)  Dr. Greenage

13

noted that Plaintiff's affect was euthymic and mood congruent. (*Id.*)

In April and May of 2012, Plaintiff reported to Dr. Greenage that he was doing well.  (R. 439, 440.)  In July, Plaintiff reported to be doing "really well."  (R. 438.)  He was sleeping well, his anxiety was under "excellent control," and appetite, energy and concentration were "doing well."  (*Id.*)  Plaintiff also reported that he had applied for a job as a cook which he was very excited about.  (*Id.*)  At his next appointment on August 30, 2012, Plaintiff told Dr. Greenage that he continued to work as a cook and he was doing very well overall.  (*Id.*)  Plaintiff denied any OCD symptomology and stated his anxiety was under excellent control but he was experiencing some sleep difficulties.  (*Id.*)  Dr. Greenage increased the dosage of Plaintiff's sleep medication and scheduled a follow-up appointment for two months with Dr. Bianco (Dr. Greenage was leaving the practice).  (*Id.*, R. 452.)

**b.    *Mental Health Evaluations***

On January 16, 2012, CRNP Polakowski completed an evaluation form.  (R. 277.)  She noted that Plaintiff had a slightly limited range of motion in his spine and found evidence of emotional or cognitive disorder with significant depression and OCD.  (R. 281-83.)

Agency psychologist Salvatore Cullari, Ph.D., found Plaintiff not disabled in the January 31, 2012, Disability Determination

Explanations.  (R. 93-114.)  The evidence reviewed included records from Dr. Baldys, Geisinger Medical Center, Susquehanna Health Medical, Dr. Rekhala, Community Services Group, and Plaintiff's and his mother's Functional Reports.  (R. 94-96.)  Dr. Cullari found Plaintiff primarily had severe affective disorders and secondarily had severe obesity.  (R. 97.)  He concluded Plaintiff did not satisfy A, B, or C criteria of the listings, adding the explanation that Plaintiff's "[r]ecent treatment notes suggest that his psychological condition is fairly stable."  (R. 97-98.)  Regarding symptoms and credibility, Dr. Cullari determined that Plaintiff's impairments could reasonable be expected to produce his symptoms, and Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms are substantiated by the objective medical evidence alone.  (R. 98.)  Dr. Cullari completed a Mental Residual Functional Capacity Assessment (R. 99-101), noting in the "Additional Explanation" section that Plaintiff's statements were found to be partially credible based on the evidence of record and Plaintiff's "adls are fair[,] [s]elf care is independent" (R. 101).  In the "Reconciling of Source Opinion," Dr. Cullari found "no indication that there is opinion evidence from any source."  (R. 101.)

On October 31, 2011, Courtney A. Suss, Ph.D., did a Bariatric Surgery Psychological Evaluation.  (R. 404.)  In addition to noting significant problem eating behaviors, Dr. Suss commented that

> [p]sychiatrically, the patient is actively
> depressed . . . .  Although he denied any
> suicidal ideation during this interview, it
> should be noted that he endorsed the presence
> of passive suicidal ideation (without intent
> or plan). . . . . The patient was encouraged to
> seek psychotherapy to supplement his
> medication and address ongoing mood and
> substance abuse symptoms.

(*Id.*)  Plaintiff reported that he had little interest or pleasure in doing things more than half the days and feels down, depressed, or hopeless more than half the days.  (R. 357.)  He also reported that he had panic attacks two months previously.  (*Id.*)  Dr. Suss found the following: Plaintiff's appearance was within normal limits and obese; his behavior was within normal limits; his speech had normal pitch and volume; his affect showed mood congruent; his thought processes were within normal limits and goal directed; his thought content was within normal limits; he was alert to person, place, time and situation; his cognition was grossly intact with good judgment and insight.  (R. 358.)  Dr. Suss opined that Plaintiff had symptoms of depression and anxiety which could interfere with focus on surgery.  (R. 365.)  She assessed a Beck Depression Inventory Score of 21 which was in the range of moderate depression.  (*Id.*)

On September 17, 2012, Dr. Greenage completed the Affective Disorder Questionnaire for Plaintiff.  (R. 451-52.)  He found that the following applied to Plaintiff "on the basis of records, interview(s), and/or tests": anhedonia or pervasive loss of

interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; decreased energy; feelings of guilt or worthlessness; difficulty in concentrating or thinking; hallucinations, delusions, or paranoid thinking; marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; repeated episodes of decompensation, each of extended duration; medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; and current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  (R. 451.) Dr. Greenage also indicated that Plaintiff would require unscheduled breaks during an eight-hour work day and would likely experience absenteeism due to his medical condition two or more days per month.  (R. 452.)

     Edwin C. Finch, Ph.D., completed a Psychological Evaluation of Plaintiff, identifying the dates of evaluation as September 21, 24,

and 25, 2012.  (R. 446.)  Plaintiff was referred to Dr. Finch by

his attorney.  (*Id.*)  Dr. Finch employed the following clinical

assessments: psychodiagnostic interviews with Plaintiff and his

mother; Bayley Functional Impairment Scale; Bayley Deficits in

Executive Function Scale; Multimodal Life History Inventory;

Minnesota Multiphasic Personality Inventory, 2nd Edition; and a

review of available records.  (R. 446.)  He notes that the

> summer of 2009 was marked by an extremely
> severe psychiatric episode.  While Mr.
> Hoskavitch had chronic anxiety and OCD . . . ,
> the 2009 episode was radical in its intensity.
> Mr. Hoskavith was utterly delusional, feeling
> he was a Hitler-like character alternating
> with a messiah-like character.  There was a
> strong mania interspersed with suicidal
> depression.

(R. 447.)  Dr. Finch added that Plaintiff "has lived an extremely

marginal life since his psychotic episode."  (R. 447.)  He also

noted that "[a]n enigma is the fact that the only way Mr.

Hoskavitch's symptoms can be controlled is with a medication

regimen that employs high doses of sedating antipsychotics.  These

are effective, but the sedation is such that the medications have a

role in [his] inergia, inactivity, anhendonia, and weight gain."

(R. 447.)   Dr. Finch got no sense of malingering or deception by

Plaintiff.  (R. 448.)  From clinical impressions and test results,

Dr. Finch concluded that Plaintiff functions in a "very tenuous

manner – one day he can have rather mild symptoms, the next day be

agitated and literally think he is an agent of god."  (*Id.*)  He

18

found that Plaintiff's ability to maintain a cognitive focus was and is clearly impaired. (*Id.*)  Dr. Finch stated that Plaintiff

> is impaired in the most basic of functions: his thinking is unclear, he is easily confused, and his reality testing is tenuous. Reality testing is the most basic function of an adult; the fact that even with aggressive pharmacotherapy, delusional thinking is just below the surface at all times is deeply impairing. Any stressor, real or perceived, erodes Mr. Hoskavitch's cognitive functioning and causes a large amount of emotionality to be triggered.

(R. 449.)  Dr. Finch concluded that Plaintiff's problems made it "virtually impossible to envision him being employed.  Even when he is functioning well ipsatively, he is not functioning in a manner that would support the basic skills and social expectations employment would entail." (*Id.*)

CRNP Polakowski completed a Physical Capacity Evaluation on September 26, 2012.  (R. 459.)  She opined that Plaintiff was able to work with restrictions.  (R. 459.)  His limitations were identified as follows: lifting ten to twenty pounds; standing/walking two to four hours in an eight-hour day; sitting two to four hours in an eight-hour day; and avoiding bending. (R. 459.)  CRNP Polakowski noted that Plaintiff would require unscheduled breaks in an eight-hour work day and would likely experience absenteeism due to his medical condition in excess of two days per month.  (*Id.*)  She stated the restrictions would be lifelong.  (*Id.*)

**2.   Physical Impairment Evidence**

In addition to the regular notation of tremors by Plaintiff's primary care providers, the records show that Plaintiff was also referred to specialists for consultation on this condition.

In June 2009, Dr. Baldys referred Plaintiff to Susquehanna Health for a left hand tremor. (R. 321.)  C. Mitchell Finch, M.D., noted that a neurologist in State College had previously diagnosed Plaintiff with essential tremor and Plaintiff reported the tremor had become progressively worse. (*Id.*)  He was prescribed Neurontin for the tremors and warned about possible side effects, including sedation, dizziness, or worsening of his psychiatric symptoms. (R. 322.)

Again in late 2010, Dr. Baldys referred Plaintiff to Susquehanna Health for consultation about his tremors. (R. 343.) By report of December 21, 2010, Stuart M. Olinsky, M.D., reported that Plaintiff had last seen Dr. Finch about the tremors in July 2009, and Plaintiff stated that stress can increase the tremors. (*Id.*)  He assessed Plaintiff to have benign essential tremors very severe in his left arm and mild in his right arm and both legs. (*Id.*)  Dr. Olinsky noted that he was concerned about starting Plaintiff on Inderal or Mysoline to treat the tremors when his dominant hand is not affected because of the side effects of depression in a patient with schizoaffective disorder. (R. 344.)

On August 31, 2011, Dr. Greenage noted a slight tremor in

Plaintiff's left hand, identifying the problem as a central tremor which Plaintiff told him he had since age 7 or 8.  (R. 275.)

Plaintiff's obesity was regularly noted in records from Dr. Baldys and CRNP Polakowski, including CRNP Polakowski's previously noted September 26, 2011, entry that Plaintiff "has had lifelong issues with his weight which has worsened significantly recently especially as he finds his obsessive-compulsive disorder and anxiety worsening."  (R. 294.)  Plaintiff weighed 394 at this visit; he weighed 374 at his visit on August 18, 2011.  (R. 295.)

Plaintiff specifically treated for his obesity at Geisinger, Danville, Nutrition Department.  (R. 422.)  He had a weight of 395 at his initial visit in October 2011, and had lost 31 pounds at his December 7, 2011, visit.  He was evaluated for bariatric surgery and Courtney Suss, Ph.D., found that Plaintiff had a number of issues to address before proceeding with weight loss surgery.  (R. 404.)

On February 23, 2012, CRNP Polakowski noted that Plaintiff's weight had once again increased (weighing 395 at this visit) and Plaintiff informed her he was continuing to be followed at Geisinger for his weight problem.  (R. 455.)

At the October 12, 2012, ALJ hearing, Plaintiff stated that he had stopped going to the weight management clinic at Geisinger about December 2011.  (R. 40.)  He weighed about 400 pounds at the time of the ALJ hearing.  (R. 41.)

21

2.   **Function Reports and ALJ Hearing Testimony**

In the "Function Report - Adult" completed on January 4, 2012, Plaintiff stated that his illnesses, injuries or conditions limited his ability to work in the following ways: his schizoaffective disorder causes him to have intense fear about leaving his house; he can't be away from his mother or his house for long periods without becoming nervous and paranoid; his fear of not pleasing his employer causes him to panic and leaves him unable to do his duty; he could not handle the feeling of working alone which was all he did as a security guard and janitor; and the essential tremor in his left hand prevents him from performing tasks which require dexterity. (R. 204.)   Plaintiff reported that previously he had been able to be alone and perform tasks without intense anxiety and paranoia. (R. 205.)   Concerning his personal needs, grooming, and medications, Plaintiff indicated that his mother tells him when to shave and wash his hair, sorts his pills and puts them in a labeled container. (R. 206.)   Plaintiff does some household chores as directed by his mother, cooks frozen dinners daily, and drives a car. (R. 206-07.)   He is unable to pay bills and handle bank accounts as he reportedly lacks focus to control his spending. (R. 207.)   Plaintiff is interested in writing, something he does frequently and reportedly well. (R. 208.)   He regularly goes to church, his friend's house, and the pharmacy but goes out less than he used to. (R. 208-09.)   Plaintiff stated that his memory,

completing tasks, concentration, understanding, following
instructions, using hands, and getting along with others were
affected by his conditions.  (R. 209.)  He indicated he could pay
attention for half an hour and could follow written directions
fairly well but spoken directions poorly.  (*Id.*)  To the question
of how well he gets along with authority figures, Plaintiff
responded that "mostly, I am very afraid of them."  (R. 210.)  To
the question of how well he handles stress, he stated that he tends
to panic.  (*Id.*)  Plaintiff also indicated he does not handle
changes in routine well.  (*Id.*)  Regarding unusual behavior or
fears, Plaintiff reported that he still experiences some of the
delusions associated with his schizoaffective disorder though he is
on medications.  (*Id.*)  Plaintiff also noted that he experiences
some drowsiness and leg tremors as side effects of his medications.
(R. 211.)

Plaintiff's mother, with whom he lives, filled out a Function
Report - Adult - Third Party on January 4, 2012.  (R. 196.)  She
stated that her son's illnesses injuries or conditions limit his
ability to work in that his mental problems make it hard for him to
be away from home for a period of time and perform any function
that requires any responsibility, his  medications have shortened
his attention span and memory, and he is intimidated by anyone in
authority.  (R. 196, 203.)  Previously he had been able to function
on a daily basis with responsibilities.  (R. 197.)  Plaintiff's

mother reported that she has to remind him to do basic grooming and personal needs tasks, and helps with Plaintiff's medications by placing them in a pill carrier, waking him in the morning to take his pills, and reminding him to do the same at night.  (R. 198.) She stated she has to be right next to him if he undertakes a chore she has asked him to do and he has no motivation to do house or yard work.  (R. 198-99.)  She stated that Plaintiff goes out but he likes to be either with her or a friend.  (R. 199.)   She confirmed his inability to handle money.  (R. 200.)  Plaintiff goes to a friend's house and goes to the movies with friends twice  a week, and he goes to church on a regular basis.  (*Id.*)  Plaintiff's mother stated that Plaintiff's memory, completing tasks, concentration, understanding, following instructions, and using hands were affected by his conditions.  (R. 201.)  She explained that the medications he is on greatly affect his memory and concentration, and he cannot focus or complete tasks without constant instructions.  (*Id.*)  She also noted that the left-hand tremors made it almost impossible for him to use that hand.  (*Id.*) Plaintiff's mother indicated that he follows written instructions pretty well and spoken instructions fairly to moderately well. (*Id.*)  She concurred that he was very intimidated by authority figures, does not handle stress well, and is very confused with changes in routine.  (R. 202.)

At the ALJ hearing on October 4, 2012, Plaintiff's and his

24

mother's testimony were consistent with the facts set out in the

Function Reports.  In answer to the ALJ's question of why he can't

work, Plaintiff pointed to the combination of OCD and

schizoaffective disorder.  Plaintiff explained:

> I get very nervous and paranoid, and I have
> these sort of intrusive images and thoughts
> that disturb me greatly and distract me a lot
> at work.  And then they become very strong,
> and they cause me to panic, you know.  And
> like I said with the paranoia, I worry a lot
> that my employers or people at the places
> where I work sort of have a sort of a desire
> to hurt me.  I also have problems with my
> delusional thinking.  They cause me a lot of
> distraction and guilt, and, eventually panic
> attacks.  And I can do okay for small periods
> of time, but I'm very volatile and will sort
> of lose control of myself, you know, in these
> panic attacks at times when I might not quite
> be expecting it.  But I guess that's the main
> problem, is I'm sort of really--my mental
> state is volatile.

(R. 47.)

The ALJ questioned Plaintiff about how his medications were

working, and Plaintiff responded that on the positive side he had

not had any auditory hallucinations but continued to have problems

with delusional thinking.  (R. 46.)  When questioned by the ALJ

about the delusional thinking Plaintiff referenced, Plaintiff

stated the following:

> Well, and like I said, I feel a lot of shame
> and guilt over them.  I would get what I
> believed were messages from God telling me
> that I was an angel of the apocalypse, and
> that I was sort of destined to be a sort of
> political leader who would help bring about
> the end of the world.  And, like I said, I

25

> feel really guilty about it, because I knew
> I'd have to hurt people along the way.  And
> it would--these thoughts would get stuck in
> my head, and I'd feel so guilty.  And, yeah,
> I guess that's the gist of it.

(R. 50.)  Plaintiff further testified that there are times he becomes convinced by the delusion and this happens as frequently as several times a week.  (R. 50.)  Regarding concentration, Plaintiff said he has intrusive thought and images he can't shake which distracts him from tasks he is trying to accomplish.  (*Id.*)

The ALJ also explored the reference in the psychiatric records that Plaintiff had worked as a cook [after the onset date of November 18, 2011].  (R. 49.)  Plaintiff said he had only worked in the kitchen at McDonald's in 2003.  (*Id.*)  He did not know why the psychiatrist would say he was working as a cook except that Plaintiff mentioned to him that he was thinking about applying for a job as a cook but that did not work out.  (*Id.*)

Plaintiff's mother, Cynthia Gordon, testified that she helped him get the janitorial jobs because she knew the owners of the businesses.  (R. 53.)  She testified about the owner's explanation for Plaintiff's workplace problems and reasons he was in danger of imminently losing his job, specifically that he didn't pay attention and missed a lot of things.  (*Id.*)

The ALJ asked why she thought Plaintiff was not frank with his psychiatrists.  (R. 55.)  Ms. Gordon explained that he was afraid of disappointing males, afraid of being yelled at, and did not want

26

to their feelings.  (*Id.*)  In addition to not wanting to disappoint, she addeed that he says he is fine because he does not want to be institutionalized again.  (*Id.*)

In response to the ALJ's question of whether she had made attempts to get Plaintiff involved in other jobs or "work-like programs," Ms. Gordon stated that she had tried to get him involved in a mental health day program where there is counseling and job placement assistance, but Plaintiff stayed only one day because he was intimidated by the people there for court-ordered services. (R. 56.)  Ms. Gordon further testified that she did not think Plaintiff is capable of working because of his panic attacks and his fears.  (R. 57.)

Vocational Expert ("VE") Josephine Doherty testified that a hypothetical claimant of the same age, education, and past work experience as Plaintiff with no exertional limitations but who would be capable of no more than simple routine tasks involving simple short instructions and simple workplace decisions with few workplace changes, and no more than occasional interaction with coworkers, supervisors, and the public would be capable of performing the jobs of janitor, laundry worker, and dishwasher-- jobs which are available in the state or national economy.  (R. 60-61.)  The ALJ then added restrictions that the hypothetical claimant should avoid concentrated exposure to unprotected heights, should never climb ropes, ladders, or scaffolds, would have no more

than occasional use of the left-dominant upper extremity for fine manipulation, but no limitation as repects gross handling.  (R. 62.)  The VE testified that the laundry and dishwasher positions would be eliminated and the janitor position would be eroded by one-half, but she would add the positions of shipping/receiving weigher, machine tender, and inserting machine operator.  (R. 62-63.)  In the next hypothetical, the ALJ limited interaction with the public, coworkers, and supervisors from occasional to rare; the VE testified that no erosion would occur with the three positions identified in the previous hypothetical.  (R. 63.)  In the final hypothetical, the ALJ added that the claimant would also be off task greater than thirty percent of the workday and would likely miss more than three days per month over and above what is normally allowed for in competitive employment.  (Id.)  The VE testified that either of those conditions would eliminate prospects for competitive employment.  (*Id.*)

## 4.   **ALJ Decision**

By decision of October 22, 2012, ALJ Langan determined that Plaintiff was not disabled as defined in the Social Security Act. (R. 27.)  He made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2015.
>
> 2.   The claimant has not engaged in substantial gainful activity since

28

November 18, 2011, the alleged onset
date (20 CFR 404.1571 *et seq.,* and
416.971 *et seq.*).

3.    The claimant has the following severe
      impairments: schizoaffective disorder,
      obsessive compulsive disorder
      (hereinafter OCD), morbid obesity and
      obstructive sleep apnea (20 CFR
      404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment
      or combination of impairments that meets
      or medically equals the severity of one
      of the listed impairments in 20 CFR Part
      404, Subpart P, Appendix 1 (20 CFR
      404.1520(d), 404.1525, 404.1526,
      416.920(d), 416.925 and 416.926).

5.    After careful consideration of the
      entire record, the undersigned finds
      that the claimant has the residual
      functional capacity to perform a full
      range of work at all exertional levels
      but with the following nonexertional
      limitations.  The claimant is limited to
      simple routine tasks, involving simple
      short instructions and simple work
      related decisions with few workplace
      changes.  The claimant is limited to no
      more than 10% to 15% interactions with
      the public, co-workers and supervisors.
      The claimant should avoid concentrated
      exposure to un-protected heights and
      never climb ropes, ladders and
      scaffolds.  The claimant is limited to
      no more than occasional use of the left
      non-dominant upper extremity for fine
      manipulation, but no limitation as for
      gross handling.

6.    The claimant has no past relevant work
      (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April 2, 1985
      and was 26 years old, which is defined
      as a younger individual age 18-49, on
      the alleged disability onset date (20

29

CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 18, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 16-26.)

In determining that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing, the ALJ relied heavily on the assessment of Salvatore Cullari, Ph.D., who evaluated the evidence in the Disability Determination Explanations. (R. 93-114.) Dr. Cullari determined that Plaintiff was mildly limited in his activities of daily living but the ALJ determined Plaintiff to be moderately limited in this area "[g]iving the claimant every possible benefit of the doubt." (R. 17.) In the areas of social functioning and concentration, persistence or pace, the ALJ agreed with Dr. Cullari's findings that Plaintiff was moderately limited. (R. 19-20.) The ALJ also

agreed with Dr. Cullari that Plaintiff had experienced no episodes
of decompensation which have been of extended duration.  (R. 19.)
The ALJ considered wether the critera of paragraphs B or C of the
relevant listings were met and determined they were not.  (R. 17-
20.)

Before considering step four of the sequential evaluation
process, the ALJ determined Plaintiff's residual functional
capacity.  (R. 20.)  The ALJ acknowledged Plaintiff's medical
problems to include schizoaffective disorder, OCD, morbid obesity
and obstructive sleep apnea, conditions he found to be severe
"insofar as they limit the claimant to non-exertional limitations"
set out in his RFC finding.  (*Id.*)  He concluded that Plaintiff's
treatment had been routine and conservative in nature; he had not
required any emergency room visits, hospitalizations or surgeries
since his alleged onset date, nor had he participated in any
therapy or counseling, treating his mental impairments with
medication alone.  (R. 22.)  The ALJ noted that Dr. Greenage's
objective mental status findings are essentially normal.  (*Id.*)
Explaining that he had given Plaintiff "every possible benefit of
the doubt" with the following limitations included in the RFC: he
limited Plaintiff to simple unskilled work and limited his contact
with the public, coworkers and supervisors to accommodate his
schizoaffective disorder and OCD; he prohibited Plaintiff's
exposure to unprotected heights and dangerous machinery and

31

climbing on ladders, ropes and scaffolds to account for his obesity, low back pain and sleep apnea; and he limited Plaintiff's use of his left extremity to account for his tremors. (*Id.*)

The ALJ further concluded Plaintiff's credibility was undermined because his subjective complaints regarding pain and functionality are beyond what the objective evidence of record indicates. (R. 23.)  He gave great weight to the opinions of Dr. Cullari because he found them consistent with the medical evidence of record. (R. 23.)  He gave little weight to the opinions of Drs. Greenage and CRNP Polakowski primarily because the objective record does not support their opinions. (R. 24.)  The ALJ gave no weight to the opinions of Dr. Finch because his conclusions are objectively internally inconsistent and lack support from other evidence of record. (R. 24.)  The ALJ also criticized certain findings in the report because they were made by subjective reporting by Plaintiff and his mother and not through a long treatment history. (R. 25.)  Little weight was given to Ms. Gordon's Function Report and testimony because she cannot be considered a disinterested third party and because her report and testimony are not consistent with the preponderance of the objective clinical evidence. (R. 23-24.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[2]  It is necessary for the
Commissioner to ascertain: 1) whether the applicant is engaged in a
substantial activity; 2) whether the applicant is severely
impaired; 3) whether the impairment matches or is equal to the
requirements of one of the listed impairments, whereby he qualifies
for benefits without further inquiry; 4) whether the claimant can
perform his past work; 5) whether the claimant's impairment
together with his age, education, and past work experiences
preclude him from doing any other sort of work.  20 C.F.R. §§
404.1520(b)-(g), 416.920(b)-(g); see Sullivan v. Zebley, 493 U.S.
521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment,
the ALJ makes a finding about the claimant's residual functional

---

[2]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less that 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

35

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary,

36

in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. *General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that

which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

## B. *Plaintiff's Alleged Errors*

As set out above, Plaintiff asserts the decision of the Social Security Administration is error because of the ALJ's consideration of treating medical providers' opinions and improper consideration of his obesity. (Doc. 10 at 7.)

## 1. Treating Medical Provider Opinions

Plaintiff first asserts that there was a lack of substantial evidence to support the ALJ's rejection of the opinions of Plaintiff's treating providers. (Doc. 10 at 7.) Defendant responds the ALJ properly evaluated the medical opinion evidence. (Doc. 13 at 9.) We conclude the ALJ did not err in his consideration of the opinions of Plaintiff's treating medical providers.

Under applicable regulations and the law of the Third Circuit,

a treating medical source's opinions are generally entitled to
controlling weight, or at least substantial weight. *See*, *e.g.*,
*Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20
C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d
Cir. 1981)).  The "treating physician rule," is codified at 20
C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit.
*Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v.
Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the
weight to be given a treating source's opinion: "If we find that a
treating source's opinion on the issue(s) of the nature and
severity of your impairment(s) is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence in your case, we
will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[3]  "A

---

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial

cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Here the ALJ stated he gave little weight to the medical source opinions because he did not find they were supported by the medical evidence.  (R. 23-25.)  Specifically, in finding the

evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

objective record did not support the opinions of Dr. Greenage, the ALJ stated "Dr. Greenage's own treatment notes ranged from normal to mild.  The most recent one in 2012 was essentially unremarkable noting the claimant's mood was good and he had a euthymic effect [sic].  The claimant's psychotropic medications have controlled his hallucinations and his delusions."  (R. 24.)  The ALJ found CRNP Polakowski's medical source statement similarly unsupported in that her treatment notes "primarily concerned minor acute ailments with essentially normal to mild objective findings" and the record as a whole failed to support any significant physical limitations.  (R. 24.)

In support of his argument that the ALJ improperly rejected treating source providers' opinions, Plaintiff points to specific evidence of record.  (Doc. 10 at 9-13.)  Much of that evidence is from a time period preceding Plaintiff's alleged onset date by more than one year.  For example, he points to an August 22, 2008, note from Dr. Rekhala, a July 26, 2010, note from CRNP Polakowski, an August 26, 2008, assessment by Dr. Patel, an August 2, 2010, assessment by the Community Services Group, and the records of Dr. Rekhala generally (which span a period from April 2008 to October 2009 (R. 324-37)).  (Doc. 10 at 8, 11.)

Plaintiff's reliance on Dr. Greenage's August 31, 2011, report regarding the details of Plaintiff's OCD and February 28, 2012, notes providing historical details of Plaintiff's delusional

41

thinking and observation that Plaintiff has several good days interspersed with the bad (Doc. 10 at 9) to support the relativity of positive reporting do not show that the ALJ erred in giving little weight to Dr. Greenage's opinion.  While we do not dispute Plaintiff's assertion that a trained psychiatrist such as Dr. Greenage is capable of "seeing through" a patient's self-reports of doing well (Doc. 10 at 9), evidence does not support applying this principle here.  Dr. Greenage's notes and objective findings do not reflect a determination by Dr. Greenage that Plaintiff's representations should be significantly discounted.  Further, no evidence suggests inaccuracy in the ALJ's observation regarding conservative and routine treatment, and lack of participation in counseling or therapy during the relevant time period (R. 22).

Plaintiff asserts that "[t]he ALJ is supposed to base his decision on the medical evidence of record, as opposed to engaging in his own analysis of the Plaintiff's condition."  (Doc. 10 at 12.)  Our review of the ALJ's decision and the medical evidence of record shows that the ALJ did base his decision on the medical evidence--he did not base his decision on opinion evidence found in various forms in the record and he explains his reasons for discounting this evidence, reasons which are acceptable under governing law.  Pursuant to 20 C.F.R. § 404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight

we will give that opinion." In reviewing an ALJ's evaluation of the evidence, we must also bear in mind that form reports are not given the same weight as more detailed medical evidence. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

In sum, we conclude Plaintiff has not shown the ALJ erred in his consideration of the opinions of treating medical providers. Because we find that the ALJ's consideration of the evidence of record to be supported by substantial evidence, remand is not warranted for reconsideration of the medical opinion evidence.

## 2. **Disabling Effects of Plaintiff's Obesity**

Plaintiff objects to the ALJ's consideration of the disabling effects of his obesity in that it should have been a factor in determining whether he meets a listing and in determining his residual functional capacity. (Doc. 10 at 14.)  Defendant responds that the ALJ properly considered Plaintiff's obesity and Plaintiff has not demonstrated how remand for further analysis would impact the outcome of the case.  (Doc. 13 at 21.)  We conclude the ALJ did not err in his consideration of Plaintiff's obesity.

SSR 02-01p addresses how obesity is to be evaluated in disability claims.  SSR 02-01p, 67 FR 57859-02, 2002 WL 31026506 (F.R. Sept. 12, 2002).  The ruling states that adjudicators are reminded to consider the effects of obesity when evaluating disability and its combined effects with other impairments.  *Id.* The effects of obesity are not only to be assessed under the

listings, but also at other steps of the sequential evaluation process, including when assessing the claimant's RFC. *Id.* In considering whether obesity is a medically determinable impairment, SSR 02-01p addresses the situation where the case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI. *Id.* The ruling states that a medical source may be asked to clarify whether the claimant has obesity, and "in most such cases we will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity." *Id.* An individual's weight over time is considered in the evaluation. *Id.*

Plaintiff avers that his "pathologic inability to control his eating . . . is, first of all, a symptom and function of his mental illness which is appropriately considered a marked difficulty in daily activities." (Doc. 10 at 15.) Adding that his "inability to control his eating reflects his marked inability to concentrate and persist in the very necessary endeavor . . . of losing weight," Plaintiff provides no citation to record evidence in support of these proffered correlations. (*Id.*)

Our review of the evidence above shows that Plaintiff's obesity is well-documented in the record. While a possible connection between Plaintiff's obesity and mental health problems

is noted (*see*, *e.g.*, R. 294-95, 301-02), associated limiting effects are not.  For example, in July 2010, CRNP Polakowski commented that Plaintiff's weight was clearly an issue––that he was concerned it was going to cause serious medical problems and he had a history of obsessing over medical issues.  (R. 302.)  She noted that she reassured Plaintiff that the long term complications of obesity are what he needed to address, and they could work on an exercise plan once his depression was stabilized.  (*Id.*)  On September 26, 2011, CRNP Polakowski noted that Plaintiff "has had lifelong issues with his weight which has worsened significantly recently especially as he finds his obsessive-compulsive disorder and anxiety worsening."  (R. 294.)  She recorded strategies to address Plaintiff's weight and explore the connection of weight with his mental health issues (R. 295), but no definitive correlation was established and Plaintiff's physical examination was unremarkable.  (*Id.*)  Thus, we find no support for Plaintiff's assertions regarding Plaintiff's obesity and marked limitations in activities of daily living as well as concentration and persistence.

While Plaintiff asserts that the ALJ does not factor Plaintiff's morbid obesity into his RFC determination, Plaintiff does not show *how* the ALJ erred.  (*See* Doc. 10 at 15.)  This conclusory statement is both inadequate to support a claimed RFC error and inaccurate: the ALJ specifically addressed Plaintiff's

obesity and concluded that certain limitations were appropriate to accommodate the condition.  (R. 22.)

Because Plaintiff has failed to meet his burden on this issue and we agree with Defendant that the ALJ satisfied his duty of considering Plaintiff's obesity at steps two through five of the sequential evaluation process (*see* Doc. 13 at 21-24), Plaintiff's claimed error regarding Plaintiff's morbid obesity is not cause for remand.

### V. Conclusion

For the reasons discussed above, Plaintiff's appeal of the Acting Commissioner's denial of benefits is denied.  An appropriate Order is filed simultaneously with this Memorandum.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge
DATED: April 27, 2015

46